**Richard RUIZ and Foundation Anchoring Systems, Inc., Plaintiffs–Cross Appellants,**

v.

**A.B. CHANCE COMPANY, Defendant–Appellant.**

**Nos. 99–1557, 99–1563.**

United States Court of Appeals, Federal Circuit.

DECIDED: Dec. 6, 2000.

W. Michael Gardner, Dady & Garner, P.A., of Minneapolis, MN; and Matthew A. Rosenberg, Herzog, Crebs & McGhee, LLP, of St. Louis, MO, argued for plaintiffs-cross appellants. With them on the brief was Mark R. Dunn, Herzog, Crebs & McGhee, LLP. Of counsel was Cheryl A. Stanton, Dady and Garner.

John H. Quinn, III, Armstrong Teasdale LLP, of St. Louis, MO, argued for defendant-appellant. With him on the brief was Andrew B. Mayfield. Of counsel was Lisa M. Wood.

Before NEWMAN, MICHEL, and RADER, Circuit Judges.

MICHEL, Circuit Judge.

The A.B. Chance Company ("Chance") appeals the decision of the United States District Court for the Eastern District of Missouri finding claims 1 through 4 and claims 6 through 8 of U.S. Patent Nos. 5,139,368 ("the '368 patent") and 5,171,107 ("the '107 patent") invalid for obviousness under 35 U.S.C. § 103 (1999). On cross-appeal, Richard Ruiz and Foundation Anchoring Systems, Inc. (a/k/a "Fasteel") argue that the district court erred in the following rulings: 1) finding infringement of claims 1 through 4 and claims 6 through 8 of the '368 and '107 patents; 2) denying recovery of attorney fees under 35 U.S.C. § 285 (1994) due to Chance's alleged inequitable conduct; 3) concluding that neither party was prevailing for the purpose of awarding costs under Fed.R.Civ.P. 54(d); and 4) granting summary judgment against Ruiz and Fasteel on their claims of

discrimination pursuant to 42 U.S.C. § 1981, breach of contract, breach of the implied duty of good faith and fair dealing, equitable and promissory estoppel, and tortious interference with contract and prospective business relations.

Because the district court failed to make factual findings on obviousness as set forth by the Supreme Court in *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966), we must vacate the judgment of invalidity and remand to the district court. On remand, we instruct the district court to make specific *Graham* findings on: 1) the reason, suggestion, or motivation present in the prior art, in the knowledge of those of ordinary skill in the art, or in the problem of foundation settling which clearly and particularly would lead one of ordinary skill in the art to combine screw anchors and metal brackets;. 2) the level of ordinary skill in the art; and 3) whether, and to what effect, evidence of secondary considerations, such as commercial success, long-felt but unresolved need, failure of others, copying, and unexpected results, is probative in the obviousness analysis.

We affirm the district court's finding of infringement, and its refusal to award attorney fees and costs. We also affirm the district court's grant of summary judgment on the non-patent claims.

## Background

### A. The Chance Patents

Since the 1970s, Chance has manufactured and sold screw anchors, also known as helical anchors, for stabilizing and supporting electrical transmission over tower legs. A screw anchor consists of "an elongated shaft presenting an earth-penetrating tip and a transversely extending load-bearing member." '368 patent, col. 2, ll. 32–35. In late 1988, Chance began using screw anchors with metal brackets to stabilize residential and commercial structures. The craft of stabilizing a sinking structure is known as "underpinning." In

March 1989, Chance engineers demonstrated a prototype of its invention to Richard Fuller and Stan Rupiper, who used a method of underpinning employing screw anchors with concrete haunches. As the district court noted, "[a]t that time, neither Fuller nor Rupiper made any indication that they felt they had already designed a bracket or had already been using a bracket or a support of the same type."

In 1992, the Patent and Trademark Office ("PTO") issued Chance the '368 and '107 patents, entitled "Method of Underpinning Existing Structures," covering its methods for underpinning residential and commercial foundations using screw anchors and metal brackets. The '107 patent is a continuation of the '368 patent, which in turn is a continuation-in-part of patent application serial number 07/464,-937 (issuing as U.S. Patent No. 5,011,336 ("the '336 patent")). The Chance patents are "concerned with an improved anchor apparatus designed to support and resist settling of structural foundations" particularly for "existing building structures having a predetermined weight and which may or has experienced settlement or movement." '368 patent, col. 1, ll. 13–20. In the method claimed in the '368 patent, the metal bracket connects the screw anchor to the foundation and transfers the dead weight and live load of the foundation to each screw anchor. *See id.*, col. 2, ll. 20–26. Users of the method place the screw anchor adjacent to the footing, and then rotate and screw the anchor "below the footing until the upper end of the shaft is adjacent the footing and a predetermined resistance to rotation of the anchor has been achieved." *Id.*, col. 2, ll. 31–39. "Upon release of rotational torque on the anchor shaft so that the anchor may return to its unstressed state, the anchor shaft and foundation and/or footing are connected via a [metal] bracket assembly to establish the desired load-bearing relationship." *Id.*, col. 2, ll. 45–50.

## B. The Prior Art

### 1. The Gregory Patents

U.S. Patent Nos. 4,911,580 ("the '580 patent") and 4,765,777 ("the '777 patent"), issued to Gregory, disclose an apparatus and method for raising and supporting a structure using push piers and metal brackets. In the Gregory method, the user attaches a metal bracket to the foundation and drives the push piers through the bracket and into the ground until encountering resistance from soil friction or impinging upon bedrock. '580 patent, col. 4, ll. 21–26. Continued force lifts the foundation, and transfers the weight of the structure to the pier. Further movement of the foundation may take place following transfer of the load, particularly if the pier is held in place by soil or friction.

### 2. The Fuller and Rupiper Method

The Fuller and Rupiper method uses screw anchors with concrete haunches as an underpinning solution. In this method, popular in settings having high seismic activity such as California, the user excavates the earth around and beneath the foundation to install a screw anchor and to place steel reinforcing rods in the excavation. The contractor then pours concrete into the excavation and allows the concrete to dry before backfilling the excavation. In the concrete haunch method, the weight of the structure is not transferred to the screw anchor until there is further downward settlement of the foundation onto the hardened concrete. This method must also be performed in a specific sequence, as the screw anchor must be installed before the concrete hardens, and the resulting connection is formed.

## C. The Distributorship Agreement between Chance and Fasteel

In April 1989, Ruiz incorporated Fasteel to provide building stabilization services using Chance's products and methods. Ruiz is Hispanic, and is the sole owner of Fasteel. In June 1989, Chance and Ruiz entered into a "Distributorship Agreement," whereby Chance appointed Fasteel to act as an authorized, non-exclusive distributor. The Agreement contained a "best efforts" clause. For the next few years, Ruiz and Fasteel sold Chance products exclusively and only used the Chance underpinning method. Ruiz and Fasteel also recruited dealers for the Chance method, created marketing materials, developed products, and conducted training programs. Ruiz extolled the advantages of the Chance methods over the prior art to other contractors.

In the 1990s, Ruiz expanded his business by forming other companies. In 1993, Ruiz incorporated Foundation Technology, Inc. ("FTI"), originally the Kansas City, Missouri, office of Fasteel. Ruiz was the sole owner of FTI. At first, FTI only sold Chance products, but by 1997, it was also the distributor for foundation repair parts not manufactured by Chance. In 1995, Ruiz and Steven Gregory established R.J. Enterprises, L.L.C., to sell Ram Jack products, which were competitive with Chance's products. The Ram Jack products utilized the Gregory patented push pier method. Ruiz had a 51 percent interest in R.J. Enterprises. Ruiz also set up Advanced Building Technology, Inc. ("ABT"), wholly-owned by Ruiz, to sell Ram Jack products. According to Ruiz, FTI or ABT would distribute Ram Jack products in locations where Ruiz was already a Chance distributor. R.J. Enterprises would service those areas where Ruiz did not distribute Chance products.

In 1996, Chance became aware that Ruiz, through one of his companies, had offered Ram Jack products to a dealer in Chance territory for which Ruiz was responsible. Chance requested that Ruiz stop the activity. Ruiz wrote Chance a letter arguing that Chance had allowed other distributors to sell competitive products, and that he believed Chance's actions to be motivated by a discriminatory purpose.

On February 18, 1997, Gary Bartee, a Chance manager, and Mike Estes, Chance's controller, signed a "Distributor Termination Request" form. The form stated that Chance was terminating Fasteel because "Fasteel, Inc., is establishing itself to promote and sell competitive underpinning system[s] through the existing Chance system dealers." The next day, Jeff Witten, the Senior Vice–President of Chance's parent company, terminated Fasteel's distributorship pursuant to a provision in the Distributorship Agreement, which permitted termination "for any reason" upon one year's notice.

After the termination, Ruiz began to market and install a combination of screw anchors manufactured by Dixie and metal brackets manufactured by Gregory. Chance alleged that Ruiz's activities infringed its method patents, and ordered Ruiz to cease his activities. Ruiz refused.

### D. The District Court Proceedings

On August 11, 1997, Ruiz and Fasteel filed suit in the United States District Court for the Eastern District of Missouri, alleging that Chance's termination of the Distributorship Agreement constituted discrimination under section 1981, breach of contract, breach of the implied duty of good faith and fair dealing, promissory and equitable estoppel, and tortious interference with contract and prospective business relations. Ruiz and Fasteel also sought a declaration of noninfringement and invalidity of Chance's two method patents (the '368 and '107 patents) and Chance's apparatus patent, U.S. Patent No. 5,120,163 ("the '163 patent"). Chance filed a counterclaim alleging infringement of the '368, '107, and '163 patents. In a well-reasoned and thorough opinion, on April 20, 1999, Judge Catherine Perry granted summary judgment against Ruiz and Fasteel on the non-patent claims.

After holding a *Markman* hearing and issuing an order construing the claims at issue, the district court held a bench trial on invalidity and infringement of the Chance patents. During trial, Chance dismissed its claim that Ruiz and Fasteel had infringed the '163 patent, and the parties narrowed the infringement issue to whether Ruiz and Fasteel had infringed claims 1 through 4 and claims 6 through 8 of the '368 and '107 patents. On May 25, 1999, the district court, in an opinion stated from the bench, found that Ruiz and Fasteel had infringed claims 1 through 4 and claims 6 through 8 of the Chance patents, and that Chance had proved with sufficient certainty $540,000 in damages. The district court, however, entered judgment for Ruiz and Fasteel, because they had showed clear and convincing evidence that claims 1 through 4 and claims 7 and 8 were invalid for obviousness in light of the teachings of the use of push piers and metal brackets as taught by the Gregory patents in combination with the use of screw anchors and concrete haunches as used by Fuller and Rupiper. On August 5, 1999, the district court amended its judgment, and found that Ruiz and Fasteel had offered clear and convincing evidence that claim 6 of the '368 and '107 patents was also invalid for obviousness.

### Opinion

### I. Obviousness under 35 U.S.C. § 103

A claimed invention is unpatentable due to obviousness if the differences between it and the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a). A patent is presumed valid, and the burden of establishing invalidity as to any claim of a patent rests upon the party asserting such invalidity. 35 U.S.C. § 282 (1994). In order to determine obviousness as a legal matter, four factual inquiries must be made concerning: 1) the scope and content of the prior art; 2) the level of ordinary skill in the art; 3) the differences between the claimed invention and the prior art; and 4) secondary considerations of nonobviousness, which in case law is often said

to include commercial success, long-felt but unresolved need, failure of others, copying, and unexpected results. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966); *Miles Labs., Inc. v. Shandon, Inc.*, 997 F.2d 870, 877, 27 USPQ2d 1123, 1128 (Fed.Cir.1993). We review the ultimate determination of obviousness de novo, while the underlying factual inquiries are reviewed for clear error. *See Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1326, 1331, 49 USPQ2d 1001, 1006 (Fed. Cir.1998). " 'A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *In re Graves*, 69 F.3d 1147, 1151, 36 USPQ2d 1697, 1700 (Fed.Cir.1995) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). Fed.R.Civ.P. 52(c) is applicable to all findings of the four inquiries in *Graham*. Rule 52(c) says that judgments must be "supported by findings of fact and conclusions of law."

In determining obviousness under section 103, the district court said that the issue "is whether a combination of the teachings of the prior art would have suggested what the patent does." The district court added that "if the prior art implicitly suggests combining the teachings of the prior art, and the claimed invention doesn't do any more than combine them, then it is invalid." Applying those standards, the district court concluded that the '368 and '107 patents "would have been obvious to that hypothetical ordinary person skilled in the art of foundation underpinning based on the teachings of the Gregory '580 and '777 patents, combined with what Fuller and Rupiper were doing with helicals [screw anchors] and concrete haunches." The district court noted that "[o]nce the idea emerged to use helicals [screw anchors] for remedial foundation work, the need for a bracket was apparent." This conclusion of what the court called a "text book case of obviousness" was based on

"[the judge's] study about what was disclosed, the prior art, the undisputed testimony in this case, and those parts of the testimony of the witnesses that [the judge] believe[d]." The district court found that all relevant prior art was disclosed to the patent examiner. The district court's opinion did not mention *Graham*, nor did it provide an analysis of what was disclosed, the prior art, or the testimony presented by the parties. Chance appeals the district court's finding of invalidity, arguing that the district court erred in failing to conduct a *Graham* analysis.

**A. Application of the *Graham* Factors**

█ Our precedent clearly establishes that the district court must make *Graham* findings before invalidating a patent for obviousness. *See Jones v. Hardy*, 727 F.2d 1524, 1529, 220 USPQ 1021, 1025 (Fed.Cir.1984) ("*Graham* was cited but its guidance was not applied, resulting in the application of hindsight and speculation."); *Custom Accessories, Inc. v. Jeffrey–Allan Indus., Inc.*, 807 F.2d 955, 961, 1 USPQ2d 1196, 1200 (Fed.Cir.1986) ("[W]hen significant legal errors are reflected in the opinion, ... which themselves shed doubt of the district court's use of *Graham*, the need for findings becomes greater and their absence rises to the level of error."). In *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 228 USPQ 90 (Fed.Cir.1985), *overruled on other grounds* by *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 46 USPQ2d 1097 (Fed.Cir.1998), we said:

In patent cases, the need for express *Graham* findings takes on an especially significant role because of an occasional tendency of district courts to depart from the *Graham* test, and from the statutory standard of unobviousness that it helps determine, to the tempting but forbidden zone of hindsight. Thus, we must be convinced from the opinion that the district court actually applied *Graham* and must be presented with enough

express and necessarily implied findings to know the basis of the trial court's opinion.

*Id.* at 873, 228 USPQ at 98 (internal citation omitted). The necessity of *Graham* findings is especially important where the invention is less technologically complex, as is the case here. *See In re Dembiczak,* 175 F.3d 994, 999, 50 USPQ2d 1614, 1617 (Fed.Cir.1999), *abrogated on other grounds* by *In re Gartside,* 203 F.3d 1305, 53 USPQ2d 1769 (Fed.Cir.2000). In such a case, the danger increases that "the very ease with which the invention can be understood may prompt one 'to fall victim to the insidious effect of a hindsight syndrome wherein that which only the inventor taught is used against its teacher.'" *Id.* (internal citation omitted). The fact that the district court does not mention *Graham* is not dispositive, as it is not reversible error if "the required factual determinations were actually made and it is clear that they were considered while applying the proper legal standard of obviousness." *Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 990, 6 USPQ2d 1601, 1607 (Fed.Cir.1988); *see also Loctite,* 781 F.2d at 873, 228 USPQ at 98.

▆ The district court's failure to base its obviousness inquiry on the explicit findings relating to the *Graham* factors can require that the judgment be vacated and the case remanded for those findings to be made. In *Custom Accessories,* we said:

If, on review of a determination of obviousness, an appellant shows that the district court incorrectly applied the law, we will not reverse (i.e., hold that defendant below failed to prove obviousness) unless appellant also convinces us that a proper application of the law to the facts of record would change the result. Sometimes, however, an appellant will convince us that the law was incorrectly applied, but there are inadequate findings by the district court to enable us to determine independently whether defendant below did or did not prove that the invention would have been obvious ...

In such circumstances, rather than find material facts ourselves, we must remand to allow the district court to do so.

*Custom Accessories,* 807 F.2d at 963, 1 USPQ2d at 1202; *see also Jones,* 727 F.2d at 1531, 220 USPQ at 1027 ("Where the evidence is conflicting or credibility determinations are required, the judgment should be vacated rather than reversed, and the case should be remanded for further proceedings."); *Loctite,* 781 F.2d at 875, 228 USPQ at 97 (vacating and remanding due to failure to make *Graham* findings); *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.,* 796 F.2d 443, 446, 230 USPQ 416, 418 (Fed.Cir. 1986) (vacating trial court opinion and remanding due to absence of *Graham* findings); *Greenwood v. Hattori Seiko Co. Ltd.,* 900 F.2d 238, 241, 14 USPQ2d 1474, 1474 (Fed.Cir.1990) (vacating summary judgment of obviousness because district court failed to undertake the required *Graham* analysis).

## 1. Scope and Content of the Prior Art/Differences Between the Claimed Invention and the Prior Art

▆ The district court erred in failing to make clear and particular findings as to why the Gregory patents and the Fuller and Rupiper method are within the appropriate scope of the prior art in determining the obviousness of the '368 and '107 patents. The scope of the prior art includes art that is "reasonably pertinent to the particular problem with which the invention was involved." *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1535, 218 USPQ 871, 876 (Fed.Cir.1983). In order to prevent a hindsight-based obviousness analysis, we have clearly established that the relevant inquiry for determining the scope and content of the prior art is whether there is a reason, suggestion, or motivation in the prior art or elsewhere that would have led one of ordinary skill in the art to combine the references. *See, e.g., In re Rouffet,* 149 F.3d 1350, 1359, 47

USPQ2d 1453, 1459 (Fed.Cir.1998) ("[T]he Board must identify specifically … the reasons one of ordinary skill in the art would have been motivated to select the references and to combine them to render the claimed invention obvious."); *In re Dembiczak*, 175 F.3d at 999, 50 USPQ2d at 1617 ("Our case law makes clear that the best defense against the subtle but powerful attraction of a hindsight-based obviousness analysis is rigorous application of the requirement for a showing of the teaching or motivation to combine prior art references."). "Determining whether there is a suggestion or motivation to modify a prior art reference is one aspect of determining the scope and content of the prior art, a fact question subsidiary to the ultimate conclusion of obviousness." *SIBIA Neurosciences, Inc. v. Cadus Pharma. Corp.*, 225 F.3d 1349, 1356, 55 USPQ2d 1927, 1931 (Fed.Cir.2000); *Tec Air, Inc. v. Denso Mfg., Inc.*, 192 F.3d 1353, 1359, 52 USPQ2d 1294, 1298 (Fed.Cir.1999) (stating that the factual underpinnings of obviousness include whether a reference provides a motivation to combine its teachings with those of another reference).

■ The district court concluded that it would have been obvious to combine screw anchors and metal brackets, because the need for a bracket "was apparent." Because there is "a general rule that combination claims can consist of combinations of old elements as well as new elements," *Clearstream Wastewater Sys. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1446, 54 USPQ2d 1185, 1189–90 (Fed.Cir.2000), "[t]he notion … that combination claims can be declared invalid merely upon finding similar elements in separate prior patents would necessarily destroy virtually all patents and cannot be the law under the statute, § 103." *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1575, 1 USPQ2d 1593, 1603 (Fed.Cir.1987); *Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*, 119 F.3d 953, 957, 43 USPQ2d 1294, 1297 (Fed.Cir.1997) ("It is insufficient to establish obviousness that the separate elements of the invention existed in the prior art, absent some teaching or suggestion, in the prior art, to combine the elements."). The test is not whether one device can be an appropriate substitute for another. *See Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1383, 231 USPQ 81, 93 (Fed.Cir.1986) ("Focusing on the obviousness of substitutions and differences instead of on the invention as a whole, as the district court did in frequently describing the claimed invention as the mere substitution of monoclonal for polyclonal antibodies in a sandwich assay, was a legally improper way to simplify the difficult determination of obviousness."). The district court must make specific findings establishing why it was "apparent" to use the screw anchor of the Fuller and Rupiper method in combination with the metal bracket as used in the Gregory patents.

■ Our court has provided a great deal of guidance on what kind of factual findings the district court may make in determining a reason, suggestion, or motivation to combine. The reason, suggestion, or motivation to combine may be found explicitly or implicitly: 1) in the prior art references themselves; 2) in the knowledge of those of ordinary skill in the art that certain references, or disclosures in those references, are of special interest or importance in the field; or 3) from the nature of the problem to be solved, "leading inventors to look to references relating to possible solutions to that problem." *Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1572, 37 USPQ2d 1626, 1630 (Fed.Cir.1996) (internal citations omitted); *In re Rouffet*, 149 F.3d at 1357, 47 USPQ2d at 1458. While the references need not expressly teach that the disclosure contained therein should be combined with another, *see Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1472, 43 USPQ2d 1481, 1489 (Fed.Cir. 1997), the showing of combinability must be "clear and particular." *In re Dembiczak*, 175 F.3d at 999, 50 USPQ2d at 1617.

There was a great deal of evidence presented to the district court that the Chance method represented an improvement over the prior art. According to the '368 patent, the Chance method is an improvement over the prior art because the Chance method is "easy to install," "low cost," and "readily installable from the outside of a house or other structure." '368 patent, col. 2, ll. 3–9. Chance also offered testimony that in its method, there is immediate verification of successful stabilization, because the appropriate resistance is mathematically calculated. In the Fuller and Rupiper and Gregory methods, the user cannot always determine whether installation occurred successfully. There was also evidence before the district court that the Fuller and Rupiper and Gregory methods may solve different problems. The Fuller and Rupiper method is found to be useful in California, because the use of concrete is especially important in underpinning foundations in settings with a high degree of seismic activity.

■ From the district court's opinion, we are unable to determine whether the district court evaluated this evidence in its obviousness analysis. Evidence which suggests that the combination of two references would suggest the resulting improvement is one way in which to demonstrate a reason, suggestion, or motivation to combine. *See In re Sernaker*, 702 F.2d 989, 994, 217 USPQ 1, 5 (Fed.Cir.1983) (stating that the district court could also determine whether the prior art offers a motivation to combine based on "whether a combination of the teachings of all or any of the references would have suggested (expressly or by implication) the possibility of achieving further improvement by combining such teachings along the line of the invention in suit"); *Hybritech*, 802 F.2d at 1380, 231 USPQ at 91 ("At most, these articles are invitations to try ... but do not suggest how that end might be accomplished."). The district court made no finding on whether the Chance method represented an improvement over the pri-

or art. If there was an improvement, it may or may not be true that any resulting improvement was due to the fact that there was evidence in the prior art, in the knowledge of those of ordinary skill in the art, or in the nature of the problem that would have suggested a reason, suggestion, or motivation that combination of the screw anchor with a metal bracket would have led to an improvement.

The district court further made no findings as to why the field of foundation underpinning would include references to both the Fuller and Rupiper and the Gregory methods, despite evidence of differences. Specifically, there were no findings on whether there was a disadvantage to the prior systems, such that the "nature of the problem" would have motivated a person of ordinary skill to combine the prior art references. "Indeed, that the elements noted by the court lay about in the prior art available for years to all skilled workers, without, as the court found, suggesting anything like the claimed inventions, is itself evidence of nonobviousness." *Panduit*, 810 F.2d at 1577, 1 USPQ2d at 1605.

## 2. Level of Ordinary Skill in the Art

■ The district court defined the person of ordinary skill in the art to be someone skilled in the art of foundation underpinnings. The determination of the level of ordinary skill in the art is an integral part of the *Graham* analysis. *See Custom Accessories*, 807 F.2d. at 962, 1 USPQ2d at 1201 ("Without [a determination of the level of ordinary skill in the art], a district court cannot properly assess obviousness because the critical question is whether a claimed invention would have been obvious at the time it was made to one with ordinary skill in the art.") (internal citation omitted). Factors that may be considered in determining the ordinary level of skill in the art include: 1) the types of problems encountered in the art; 2) the prior art solutions to those problems; 3) the rapidity with which innovations are made; 4) the sophistication of the technology; and 5)

the educational level of active workers in the field. *See id.* at 962, 807 F.2d 955, 1 USPQ2d at 1201 (citing *Envtl. Designs, Ltd. v. Union Oil Co.,* 713 F.2d 693, 697, 218 USPQ 865, 868–69 (Fed.Cir.1983)). "Not all such factors may be present in every case, and one or more of them may predominate." *Id.* Some of our cases indicate that the failure to make explicit findings on the level of ordinary skill is not always reversible error. *See, e.g., Kloster Speedsteel AB v. Crucible Inc.,* 793 F.2d 1565, 1574, 230 USPQ 81, 86 (Fed.Cir. 1986); *Union Carbide Corp. v. American Can Co.,* 724 F.2d 1567, 1573, 220 USPQ 584, 589 (Fed.Cir.1984); *Chore–Time Equip., Inc. v. Cumberland Corp.,* 713 F.2d 774, 779 n. 2, 218 USPQ 673, 676 n. 2 (Fed.Cir.1983). However, as we noted in *Custom Accessories,* in those cases, "it was not shown that the failure to make a finding or an incorrect finding on level of skill influenced the ultimate conclusion under section 103 and, hence, constituted reversible error." *Custom Accessories,* 807 F.2d at 963, 1 USPQ2d at 1201.

 It is disputed whether Ruiz and Fasteel offered clear and convincing evidence that others of ordinary skill in the art would have thought the Chance inventions obvious. Robert Jones, a distributor for Chance, testified that he first used a metal bracket with a screw anchor in a "tie-back" or lateral retention in October or November 1989. However, Jones also testified that he possessed "greater than ordinary skill in the art," since he had been building and designing steel load transfer hardware for over thirty years. Without a more specific finding of what the level of ordinary skill in the art is, the district court cannot adequately determine whether Jones' testimony would support a finding of obviousness.

Accordingly, on remand, while "we do not reverse or vacate solely because of a failure to make the level of skill finding," we do "consider the district court's failure to make that and other *Graham* findings as evidence that *Graham* was not in fact applied." *Id.*

### 3. Secondary Considerations

 The district court erred in failing to consider, or at least to discuss, evidence of secondary considerations. Our precedents clearly hold that secondary considerations, when present, must be considered in determining obviousness. *See, e.g., Loctite,* 781 F.2d at 873, 228 USPQ at 98 ("[S]econdary considerations ..., when present, must be considered."); *Simmons Fastener Corp. v. Ill. Tool Works, Inc.,* 739 F.2d 1573, 1575, 222 USPQ 744, 746 (Fed. Cir.1984) ("Only after all evidence of non-obviousness has been considered can a conclusion on obviousness be reached."); *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.,* 776 F.2d 281, 306, 227 USPQ 657, 662 (Fed.Cir.1985) ("Just as it is legal error for a district court to fail to consider relevant evidence going to secondary considerations, it may be legal error for a district court to presuppose that all evidence relating to secondary considerations, when considered with the other *Graham* indicia relating to the obviousness/nonobviousness issue, cannot be of sufficient probative value to elevate the subject matter of the claimed invention to the level of patentable invention."). Indeed, in *Stratoflex,* we said:

> [E]vidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not. It is to be considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art.

*Stratoflex,* 713 F.2d at 1538, 218 USPQ at 879. Such evidence "may be sufficient to overcome a prima facie case of obviousness." *In re Beattie,* 974 F.2d 1309, 1313, 24 USPQ2d 1040, 1043 (Fed.Cir.1992); *see also SIBIA,* 225 F.3d at 1358, 55 USPQ2d at 1933 ("[T]he mere existence of ... licenses [i.e., secondary considerations] is

insufficient to overcome the conclusion of obviousness, as based on the express teachings in the prior art that would have motivated one of ordinary skill to modify ... cells to be used with unknown compounds."). Our precedents also establish that failure to cite secondary considerations, alone, is not reversible error. *See Brown & Williamson v. Philip Morris*, 229 F.3d 1120, 1131 (Fed.Cir.2000) (stating that failure of the district court to consider certain objective evidence of nonobviousness was harmless error, because it "cannot overcome the strong evidence of nonobviousness").

▮ In the present case, Chance presented testimony that the Chance method enjoyed success with those in the underpinning industry. The number of dealers using the Chance method rose from 34 in 1991 to 209 in 1999. This increase in dealers contributed to a 20% annual increase in Chance's sales, compared to a 5.5% annual growth rate in the construction materials industry as a whole. Chance presented further evidence that dealers attributed an increase in business to the Chance method. Installers switched from competing methods, and testified as to a nexus between their commercial success and their use of the Chance underpinning method. Chance also presented testimony that Rupiper, one of the inventors of the prior art, had expressed skepticism that Chance's prototype model offered advantages over the concrete haunch method. "[P]roceeding contrary to the accepted wisdom ... is 'strong evidence of unobviousness.'" *In re Hedges*, 783 F.2d 1038, 1041, 228 USPQ 685, 687 (Fed.Cir.1986) (citing *W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1552, 220 USPQ 303, 312 (Fed.Cir. 1983)).

From the district court opinion, we are unable to determine whether the district court considered these factors, and found them insufficient to rebut a strong prima facie case of obviousness, or whether the district court failed to consider them at all

in its obviousness calculus. *See In re Beattie*, 974 F.2d at 1313, 24 USPQ2d at 1043. Nor can we tell whether the judge made implicit findings after hearing testimony. Accordingly, we urge the district court to make findings as to: 1) whether secondary considerations rebut a prima facie case of obviousness; and 2) if the evidence of secondary considerations is probative, whether there is a nexus between the claimed invention and commercial success. *See Simmons*, 739 F.2d at 1575, 222 USPQ at 746 ("A nexus between the merits of the claimed invention and evidence of secondary considerations is required in order for the evidence to be given substantial weight in an obviousness decision.").

## B. Conclusion

▮ Accordingly, we vacate the district court's judgment and remand the case to the district court in order for *Graham* findings to be made. In *Jones*, we said that "[w]here the evidence is conflicting or credibility determinations are required, the judgment should be vacated rather than reversed, and the case should be remanded for further proceedings (not excluding a new trial if the district court deemed it necessary)." *Jones*, 727 F.2d at 1531, 220 USPQ at 1027. In *Jones*, this court reversed the district court's conclusion of obviousness because probative facts were not in dispute, no credibility determinations needed to be made, and the litigation had been going on for ten years. *See id.* In this case, however, probative facts are in dispute, and credibility needs to be assessed. On remand, the district court will have an opportunity to assess the relevant evidence, and only if the court concludes that Ruiz and Fasteel presented clear and convincing evidence establishing facts that support obviousness, may it enter judgment in their favor on invalidity.

## II. Infringement of the '368 and '107 Patents

▮ "An infringement analysis entails two steps. The first step is determin-

ing the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device [or process] accused of infringing." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976, 34 USPQ2d 1321, 1326 (Fed.Cir.1995) (en banc), *aff'd* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996). Claim construction is a question of law reviewed de novo. *See Cybor Corp. v. FAS Techs, Inc.*, 138 F.3d 1448, 1456, 46 USPQ2d 1169, 1174 (Fed.Cir.1998) (en banc). Comparing the properly construed claims to the accused device is a question of fact reviewed for clear error. *See Charles Greiner & Co. v. Mari–Med Mfg., Inc.*, 962 F.2d 1031, 1034, 22 USPQ2d 1526, 1528 (Fed.Cir.1992).

Claim 1 of the '368 patent contains the following first step:

> 1. In a method of stabilizing the below-grade foundation of an existing building structure having a predetermined weight and an assumed live load, the improved steps of:
>
>> providing a foundation support for the foundation at a plurality of positions along the foundation ...

Claim 1 of the '107 patent is the same.

In an opinion construing the claims of the '368 and '107 patents, the district court said that the "the term 'providing' [in claim 1] means that the support must be supplied or furnished at each location where stabilization is to occur." Because the "brackets are in existence and provided as required by the claims," the district court found that the Fasteel methods infringed claims 1 through 4 and claims 6 through 8 of the '368 and '107 patents. Alternatively, the district court found that Chance proved infringement under the doctrine of equivalents. Neither party disputes the district court's claim construction.

▮ Ruiz and Fasteel contend that the district court erred in finding that their method of underpinning infringed the '368 and '107 patents. Ruiz and Fasteel argue that in their method, the bracket does not have to be located near the stabilizing positions when the screw anchor is screwed into the ground. Instead, the bracket may be located elsewhere, such as in a nearby truck or near a supply pile on the ground of the job site.

In Fasteel's method, because metal brackets are in existence and available for use by the installer, they are "provided" within the meaning of claim 1. There is nothing in the claims or specification which indicates that the metal bracket had to be physically attached to or located next to the foundation before the other steps in the method could proceed. Thus, we find that the district court did not commit clear error in finding that the Fasteel method infringed claims 1 through 4 and claims 6 through 8 of the '368 and '107 patents.

## III. Attorney Fees under 35 U.S.C. § 285

▮ 35 U.S.C. § 285 provides for the "award [of] reasonable attorney fees to the prevailing party" in "exceptional" patent infringement cases. Whether a case is "exceptional" under section 285 is a question of fact that we review under a clearly erroneous standard. *See Hoffmann–La Roche, Inc. v. Invamed, Inc.*, 213 F.3d 1359, 1365, 54 USPQ2d 1846, 1850 (Fed. Cir.2000). The prevailing party must prove the exceptional nature of the case by clear and convincing evidence. *See Carroll Touch Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1584, 27 USPQ2d 1836, 1845 (Fed.Cir.1993). Only if a court finds that a prevailing party satisfies its burden of proving an exceptional case does it determine whether to award attorney fees. *See Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*, 182 F.3d 1356, 1359, 51 USPQ2d 1466, 1468 (Fed.Cir.1999).

▮ A finding of inequitable conduct can be the basis for awarding attorney fees under section 285. *See AB Chance v. RTE Corp.*, 854 F.2d 1307, 1312,

7 USPQ2d 1881, 1885 (Fed.Cir.1988). "Inequitable conduct resides in failure to disclose material information, or submission of false information, with an intent to deceive." *Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 872, 9 USPQ2d 1384, 1389 (Fed.Cir.1988) (internal citation omitted). Both materiality and intent must be proven by clear and convincing evidence. *Id.* Once the threshold levels of materiality and intent have been established, "those fact findings are balanced to make the determination whether 'the scales tilt to a conclusion that inequitable conduct occurred.'" *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 551, 16 USPQ2d 1587, 1592 (Fed.Cir. 1990) (internal citation omitted). "The more material the omission or the misrepresentation, the lower the level of intent required to establish inequitable conduct, and vice versa." *Critikon Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256, 43 USPQ2d 1666, 1668 (Fed. Cir.1997). We review the threshold determinations of materiality and intent under the clearly erroneous standard of Fed. R.Civ.P. 52(a). *See Kingsdown*, 863 F.2d at 872, 9 USPQ2d at 1389. We review the district court's ultimate determination of inequitable conduct under an abuse of discretion standard. *See id.* at 876, 863 F.2d 867, 9 USPQ2d at 1389.

 The district court found that Ruiz and Fasteel failed to prove that material information had been withheld by clear and convincing evidence. Ruiz and Fasteel claim that in prosecuting the '368 and '107 patents, Chance failed to properly disclose the use of screw anchors as taught in the Fuller and Rupiper methods. The district court found that the screw anchor language was properly disclosed in the specification of the '368 and '107 patents. The district court said, "the earth anchor language in the specification combined with the reference to a piling and other materials in the patent file wrapper history are sufficient to disclose the Fuller Rupiper prior art." The district court also

found that there was no evidence of intent to deceive.

We agree with the district court that Ruiz and Fasteel failed to offer clear and convincing evidence of the materiality of withholding information or of an intent to deceive. At the very least, the court's findings are not clearly erroneous. Accordingly, we affirm the district court's judgment of no liability for attorney fees.

## IV. Award of Costs under Fed.R.Civ.P. 54(d)

 Ruiz and Fasteel argue that the district court erred in holding that neither party was the prevailing party for the purpose of awarding costs pursuant to Fed.R.Civ.P. 54(d)(1). Rule 54(d)(1) provides for the award of "costs other than attorneys' fees ... to the prevailing party unless the court otherwise directs." A party who is successful in declaring a competitor's patent invalid is a prevailing party for purposes of the rule. *See Manildra Milling Corp. v. Ogilvie Mills, Inc.*, 76 F.3d 1178, 1183, 37 USPQ2d 1707, 1711 (Fed.Cir.1996). An award of costs under Rule 54(d)(1) falls within the discretion of the trial court. *See id.* ("[E]ven if a party satisfies the definition of prevailing party, the district court retains broad discretion as to how much to award, if any.").

 In this case, Ruiz and Fasteel prevailed on the patent invalidity issue, but Chance prevailed on all of the other issues, including the non-patent issues. The district court did not err in refusing to award costs, for neither party prevailed sufficiently to require an award of costs and make a decision not to do so an abuse of discretion.

## V. Non–Patent Claims

Ruiz and Fasteel also cross appeal the district court's grant of summary judgment on their non-patent claims. "Summary judgment is appropriate when there is no genuine issue as to any material fact and ... the moving party is entitled to

judgment as a matter of law." Fed. R.Civ.P. 56(c). Summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When deciding a summary judgment motion, all of the nonmovant's evidence is to be credited, and all justifiable inferences drawn in the nonmovant's favor. *See id.* at 255, 106 S.Ct. 2505. We review a district court's grant of summary judgment de novo. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### A. Discrimination under 42 U.S.C. § 1981

Ruiz and Fasteel allege that Chance terminated the Distributorship Agreement in violation of 42 U.S.C. § 1981 (1994), because Ruiz is Hispanic. 42 U.S.C. § 1981 provides that all persons within the jurisdiction of the United States "shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens." "[I]dentifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics" enjoy protection under section 1981. *St. Francis College v. Al-Khazraji,* 481 U.S. 604, 613, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987). Under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), in order to establish a section 1981 case, Ruiz must first establish a prima facie case of discrimination by showing: 1) he fell within a class of persons protected under section 1981; 2) Fasteel met the necessary qualifications to be a Chance distributor; 3) Fasteel's ability to make and enforce contracts was adversely affected by Chance's actions; and 4) there was evidence that Chance's actions were motivated by animus based on national origin. *See Barge v. Anheuser–Busch, Inc.,* 87 F.3d 256, 258 (8th Cir.1996). In analyzing Ruiz's and Fasteel's claim, the district court assumed that appellees had made

out a prima facie case, thus entitling them to a rebuttable presumption of discrimination. *See Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

In order to rebut the presumption of discrimination arising out of establishment of a prima facie case, Chance must advance a legitimate, non-discriminatory reason for its actions. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Chance only has a burden of production, not persuasion. *See id.* at 509, 113 S.Ct. 2742. If Chance produced a legitimate, non-discriminatory reason for its actions, Ruiz and Fasteel could still prevail by proffering evidence that Chance's reasons for its actions were a pretext for discrimination. *See Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. Ruiz and Fasteel bear the burden of establishing the existence of facts which, if proven at trial, would permit a jury to conclude that intentional discrimination was the true motivating force behind Chance's actions. *See St. Mary's Ctr.,* 509 U.S. at 507–08, 113 S.Ct. 2742.

The district court found that Chance offered a legitimate, non-discriminatory reason for its actions. Chance terminated Fasteel because "Ruiz, Fasteel's sole owner, was not using his best efforts to support defendant's business, as exemplified by Ruiz's involvement with Ram Jack." The district court also found that Ruiz and Fasteel failed to offer evidence demonstrating that Chance's reason was pretextual. Ruiz and Fasteel argue that Chance's reason was pretextual because: 1) Fasteel never directly dealt in products competitive to Chance's; and 2) other Chance dealers and distributors sold competitive products and Chance did not terminate them. The district court found that although there was evidence suggesting that some of Chance's dealers and distributors carried competitive products, Ruiz and Fasteel failed to show that the other dealers and distributors were simi-

larly situated to Ruiz and Fasteel. *See Ghane v. West*, 148 F.3d 979, 982 (8th Cir.1998) (although instance of disparate treatment can support a claim of pretext, the plaintiff has the burden of showing that he is similarly situated in all relevant respects to the individuals treated more favorably). The district court also found that Ruiz and Fasteel failed to offer any evidence that Chance personnel had "ever made any comments or engaged in any overt conduct that might ... be perceived as evincing hostility towards Ruiz based on his Hispanic background."

Because the evidence presented to the district court was not sufficient to create a genuine issue of material fact, we affirm the district court's grant of summary judgment on the section 1981 claim.

### B. Breach of Contract

Ruiz and Fasteel allege that the district court erred in granting summary judgment on their breach of contract claim. The relevant portion of the Distributorship Agreement between Fasteel and Chance states:

> This Agreement may be terminated at any time *for any reason* upon (1) sixty (60) days written notice by DISTRIBUTOR to CHANCE, or (2) upon one (1) year's written notice by CHANCE to DISTRIBUTOR, OR (3) as mutually agreed upon in writing by both parties. (emphasis added).

Ruiz and Fasteel argue that the language "for any reason" requires "a good reason." To support their interpretation, Ruiz and Fasteel offer extrinsic evidence of a conversation between Bill Edwards, a Chance Vice–President, and Ruiz, where Edwards allegedly told Ruiz that the agreement would only be terminated for "a good reason," and only after Fasteel received notice of any deficiency and had an opportunity to cure. Ruiz and Fasteel also argue that the "usage of the trade" demonstrates that termination cannot occur absent good cause.

The district court found that Ruiz and Fasteel failed to provide evidence sufficient to create a genuine issue of material fact on their breach of contract claim. Under Missouri law, unless the contract is ambiguous, extrinsic evidence cannot be admitted to contradict, alter, or add to the terms of a contract. *See, e.g., Stewart Title Guar. Co. v. WKC Restaurants Venture Co.*, 961 S.W.2d 874, 881 (Mo.Ct.App. 1998). Further, usage of trade evidence cannot be admitted because it would violate Paragraph 25 of the Distributorship Agreement which states that "no course or prior dealings and no usage of trade shall be relevant to supplement or explain any terms used in this Agreement." Accordingly, the district court properly found that the contract at issue here is unambiguous in allowing termination of the contract for "any reason." *See, e.g., Emerick v. Mut. Benefit Life Ins. Co.*, 756 S.W.2d 513, 522 (Mo.1988) (en banc) (holding that language "at any time" meant that party had no obligation to provide reasons). Summary judgment was appropriately granted.

### C. Breach of the Implied Duty of Good Faith and Fair Dealing

Ruiz and Fasteel's third non-patent claim charges Chance with breaching the Distributorship Agreement's implied duty of good faith and fair dealing. This duty was breached, Ruiz and Fasteel allege, because: 1) Chance's anti-Hispanic bias resulted in Fasteel's termination; 2) Chance offered no reason for terminating Fasteel; and 3) after the termination, Chance dealt directly with Fasteel's dealers.

Missouri law implies a duty of good faith and fair dealing in every contract. *See, e.g., Farmers' Elec. Coop., Inc. v. Mo. Dep't of Corrections*, 977 S.W.2d 266, 271 (Mo.1998) (en banc). To prevail on a breach of duty claim, the party must present "substantial evidence" that the other party "acted in bad faith or engaged in unfair dealing." *Acetylene Gas Co. v. Oliver*, 939 S.W.2d 404, 410 (Mo.Ct.App.

1996). The district court properly found that Ruiz and Fasteel failed to present "substantial evidence" that Chance breached the implied duty of good faith and fair dealing. Ruiz and Fasteel presented no credible evidence that Chance's termination was motivated by racial animus or that Chance failed to proffer a reason for terminating Fasteel. Further, Paragraph 12 of the Distributorship Agreement expressly provides that Chance is permitted to "sell, lease or transfer" its products to other purchasers "wheresoever the latter may be located." Thus, the lack of existence of a genuine material fact supports the district court's grant of summary judgment.

### D. Promissory and Equitable Estoppel

Ruiz and Fasteel's fourth claim alleges that they sustained damages of over one million dollars in relying on Chance's representations to their detriment. The district court properly found that Ruiz and Fasteel cannot rely on a theory of equitable estoppel because under Missouri law, equitable estoppel "is an affirmative defense or an affirmative avoidance in response to an affirmative defense." *Hoag v. McBride & Son Inv. Co.*, 967 S.W.2d 157, 171 (Mo.Ct.App.1998). The district court also properly found that a cause of action for promissory estoppel is not available. Under Missouri law, promissory estoppel is not available as a cause of action "when an unambiguous contract exists that covers the issue for which damages are sought." *Halls Ferry Inv., Inc. v. Smith*, 985 S.W.2d 848, 852 (Mo.Ct.App. 1998). Recovery for promissory estoppel also cannot lie where there is an adequate remedy at law. *See Zipper v. Health Midwest*, 978 S.W.2d 398, 412 (Mo.Ct.App. 1998). Moreover, Ruiz and Fasteel presented no credible evidence that they relied on Chance's promises to their detriment. Summary judgment was proper.

### E. Tortious Interference with Contract and Prospective Business Relations

Ruiz and Fasteel's final non-patent claim alleges that Chance had disrupted or destroyed Fasteel's existing and prospective contractual and business relations. In order to prevail, Ruiz and Fasteel must prove five elements: 1) a contract or valid business expectancy; 2) Chance's knowledge of the contract or relationship; 3) intentional interference by Chance inducing or causing a breach of the contract or relationship; 4) absence of justification; and 5) damages resulting from Chance's conduct. *See Nazeri v. Mo. Valley College*, 860 S.W.2d 303, 316 (Mo.1993) (en banc); *Thomas Phelps Found. v. Custom Ins. Co.*, 977 S.W.2d 33, 37 (Mo.Ct. App.1998). Ruiz and Fasteel contend that Chance notified its dealers that Chance terminated Fasteel due to bad credit, and that Chance was attempting to sell directly to them, in violation of their agreement with Fasteel. The district court found that except for Ruiz's uncorroborated statement, there was no evidence that Chance ever made such a statement, or that Chance's alleged statement "caused the breach of any contract Fasteel may have had with its dealers." Accordingly, the district court's grant of summary judgment was proper.

### Conclusion

We conclude that the district court erred in failing to make sufficient findings as required by *Graham* and Fed.R.Civ.P. 52(c). Accordingly, we vacate the district court's judgment of invalidity and remand the case to the district court for appropriate findings on the obviousness factors. At its discretion, the district court may rely on or enlarge the evidentiary record. We affirm the district court's finding of infringement of the '368 and '107 patents, and affirm its refusal to award attorney fees and costs. We also affirm the district court's grant of summary judgment on the non-patent claims. Therefore, if the dis-

trict court does not invalidate both asserted patents, judgment of damages as found and not appealed may be reinstated.

## Costs

Each party shall bear its own costs.

*AFFIRMED–IN–PART, VACATED–IN–PART, and REMANDED.*